1  | LIONEL Z. GLANCY (#134180)
2  | MICHAEL GOLDBERG (#188669)
   | ROBERT V. PRONGAY (#270796)
3  | **GLANCY BINKOW & GOLDBERG LLP**
   | 1925 Century Park East, Suite 2100
4  | Los Angeles, CA 90067
5  | Telephone: (310) 201-9150
   | Facsimile: (310) 201-9160
6  | Email: info@glancylaw.com

7  | **POMERANTZ GROSSMAN HUFFORD**
8  | **DAHSLTROM & GROSS LLP**
   | Jeremy A. Lieberman
9  | 600 Third Avenue, 20th Floor
   | New York, New York 10016
10 | Telephone:    (212) 661-1100
11 | Facsimile:    (212) 661-8665

12 | *Attorneys for Plaintiff*
13 | *[Additional Counsel on signature page]*

14 |                   **UNITED STATES DISTRICT COURT**
15 |                   **NORTHERN DISTRICT OF CALIFORNIA**

16 | BRIAN GOECKER, Individually and on Behalf          Case No.
17 | of All Others Similarly Situated,
18 |                                Plaintiff,           CLASS ACTION
19 |                    v.                               **COMPLAINT FOR**
                                                         **VIOLATION OF THE**
20 | UBIQUITI NETWORKS, INC., ROBERT J.                  **FEDERAL SECURITIES LAWS**
21 | PERA, JOHN RITCHIE, PETER Y. CHUNG,
   | CHRISTOPHER J. CRESPI, CHARLES J.
22 | FITZGERALD, JOHN L. OCAMPO, ROBERT
23 | M. VAN BUSKIRK, UBS SECURITIES LLC,                 **DEMAND FOR JURY TRIAL**
   | DEUTSCHE BANK SECURITIES INC.,
24 | RAYMOND JAMES & ASSOCIATES, INC.,
   | PACIFIC CREST SECURITIES LLC and
25 | THINKEQUITY LLC,
26 |                                Defendants.
27 |
28 |

FILED BY FAX
PURSUANT TO LOCAL RULES

ORIGINAL FILED

SEP 13 2012

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California

CV12 - 04801

SI

Plaintiff Brian Goecker ("Plaintiff") has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Ubiquiti between October 14, 2011 and August 9, 2012, inclusive (the "Class Period"), and/or who acquired shares of Ubiquiti common stock pursuant or traceable to the Company's false and misleading Registration Statement and Prospectus issued in connection with its October 14, 2011 initial public offering ("IPO"), seeking to pursue remedies under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

2.     Ubiquiti offers a portfolio of wireless networking products and solutions, including systems, high performance radios, antennas and management tools, designed for wireless networking and other applications in the unlicensed radio frequency ("RF") spectrum. The Company offers solutions that incorporate its RF technology, antenna design and firmware technologies, which it refers to as Air Technologies.

3.     On or about October 14, 2011, Ubiquiti filed its Prospectus for the IPO, which forms part of the Registration Statement and which became effective on October 13, 2011. In connection with the IPO, approximately 7.038 million shares of Ubiquiti common stock were

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

sold to the public at $15 per share, raising $105.6 million in gross proceeds for the Company and the selling shareholders.

4.      On May 1, 2012, after announcing disappointing third quarter fiscal year 2012 financial results, the Company acknowledged that Kozumi USA Corp. ("Kozumi"), a former distributor of Ubiquiti's, had stolen source codes and proprietary designs for the Company's popular and profitable AirMax line of products and was engaged in a scheme to manufacture and distribute counterfeit Ubiquiti products in South America and other emerging markets in direct competition with the Company.

5.      As a result, Ubiquiti shares plummeted $6.10 per share or more than 17%, to close at $28.90 per share on May 2, 2012.

6.      On August 9, 2012, Ubiquiti announced its fourth quarter fiscal 2012 financial results and disappointing guidance for the first quarter of fiscal 2013. Ubiquiti admitted that the distribution of the unauthorized copies of its communication gear was more widespread than previously disclosed and would have a detrimental impact on the Company's future results.

7.      As a result, Ubiquiti shares declined $6.30 per share or nearly 42%, to close at $8.71 per share on August 10, 2012.

8.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) the true magnitude of the risks the Company faced from counterfeit goods in connection with the Company's products including the popular and profitable AirMax; (ii) the widespread nature and extent of the counterfeit operations and the impact the counterfeit activities would have on the Company's future operating results; (iii) the increased risks to the Company's operations due to its unique

business model, whereby it relied exclusively upon distributors to sell its products to end customers; (iv) that the Company lacked the proper internal controls to prevent its product designs from being stolen and replicated; and (v) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

9.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to §§ 11 and 15 of the Securities Act [15 U.S.C. §§ 77k and 77o], and §§ 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and SEC Rule 10b-5 [17C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, § 27 of the Exchange Act [15 U.S.C. § 78aa] and § 22 of the Securities Act, [15 U.S.C. § 77v].

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

12.      In connection with the challenged conduct, Defendants, directly or indirectly, used the means or instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.      Plaintiff Brian Goecker, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Ubiquiti during the Class Period and has been damaged thereby.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

14.     Defendant Ubiquiti designs, manufactures and sells broadband wireless solutions worldwide. Ubiquiti's principal executive offices are located at 91 East Tasman Drive, San Jose, California 95134.

15.     Defendant Robert J. Pera ("Pera") founded the Company and serves as Chief Executive Officer ("CEO") and a director of Ubiquiti. Pera signed the false and misleading Registration Statement.

16.     Defendant John Ritchie ("Ritchie") serves as Chief Financial Officer ("CFO") of Ubiquiti. In the IPO, Ritchie sold 82,500 shares of his Ubiquiti stock for gross proceeds of $1.2 million. Ritchie signed the false and misleading Registration Statement.

17.     Defendant Peter Y. Chung ("Chung") serves as a director of Ubiquiti. Chung signed or authorized the signing of the false and misleading Registration Statement.

18.     Defendant Christopher J. Crespi ("Crespi") served as a director of Ubiquiti from October 2010 to December 1, 2011. Crespi signed or authorized the signing of the false and misleading Registration Statement.

19.     Defendant Charles J. Fitzgerald ("Fitzgerald") serves as a director of Ubiquiti. Fitzgerald signed or authorized the signing of the false and misleading Registration Statement.

20.     Defendant John L. Ocampo ("Ocampo") serves as a director of Ubiquiti. In the IPO, Ocampo sold 297,000 shares of his Ubiquiti stock for gross proceeds of $4.5 million. Ocampo signed or authorized the signing of the false and misleading Registration Statement.

21.     Defendant Robert M. Van Buskirk ("Van Buskirk") serves as a director of Ubiquiti. Van Buskirk signed or authorized the signing of the false and misleading Registration Statement.

22.     The defendants referenced above in ¶¶ 15 and 16 are referred to herein as the "Officer Defendants."

23.     The defendants referenced above in ¶¶ 17-21 are referred to herein as the "Director Defendants" and are named as defendants solely for violations of the Securities Act.

24.     Defendant UBS Securities LLC ("UBS") is a leading global investment banking and securities firm, and one of the largest global asset managers. UBS acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

25.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is the U.S. investment banking and securities arm of Deutsche Bank AG. Deutsche Bank provides investment banking products and services. Deutsche Bank acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

26.     Defendant Raymond James & Associates, Inc. ("RJA") is a financial investment advisory firm. RJA acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

27.     Defendant Pacific Crest Securities LLC ("Pacific Crest") provides investment banking products and services. Pacific Crest acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

28.     Defendant ThinkEquity LLC ("ThinkEquity") provides institutional brokerage, investment banking, and asset management services to small and middle market public and privately held companies and individuals. ThinkEquity acted as an underwriter for Ubiquiti's IPO, helping to draft and disseminate the offering documents.

29.     The defendants named in ¶¶ 24-28 are referred to herein as the "Underwriter Defendants."

30.     Defendant Ubiquiti and the Officer and Director Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement. The Underwriter Defendants drafted and disseminated the offering documents and were paid more than $7 million in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

### BACKGROUND

31.     Ubiquiti makes products designed to help Internet service providers deliver high speed broadband access, often in emerging markets. Its popular AirMax line makes up over 60% of the Company's annual revenue. Ubiquiti's target markets are countries that are poorly addressed and underdeveloped in terms of Internet usage. Over 80% of Ubiquiti's sales come from international markets, including China and countries in South America.

32.     Ubiquiti has a unique business model for a hardware company, as it operates a very lean distribution business model. It does not have a direct sales force, but instead relies upon its social networking to facilitate market awareness and demand for its products and solutions. It utilizes its "community" (via the Ubiquiti Forum) to instigate sales. The Company sells most of its products to distributors rather than to end customers.

33.     Kozumi served as a distributor for Ubiquiti products in South America from May 2008 until September 2009. Shao Wei Hsu ("Hsu"), a Brazilian citizen, is the sole officer and director of Kozumi. In September 2009, Ubiquiti terminated its agreement with Kozumi upon discovering that Kozumi was offering copycat products under the Kozumi name, in violation of its distribution agreement with Ubiquiti, Subsequently, Hsu initiated a counterfeit scheme with Kenny Deng ("Deng"), owner of a Hong Kong manufacturing facility called Hoky Technology ("Hoky"), in order to steal Ubiquiti's source codes and proprietary designs for the Company's

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

popular AirMax platform of products. Once the stolen designs were procured, Hoky began manufacturing counterfeit Ubiquiti products based upon the stolen source codes and proprietary designs at its facility in Shenzhen, China. Simultaneously, Hsu obtained a trademark for "UBIQUITI NETWORKS" in Argentina in October 2010 and began distributing the counterfeit goods throughout South America and to other emerging markets.

34.     In March 2011, Ubiquiti was notified by a distributor in China that counterfeit goods were being manufactured by Hoky. Over the course of the next several months, Ubiquiti investigated the claims and verified their accuracy, confirming that counterfeit Ubiquiti goods were in fact being manufactured at Hoky's Shenzhen plant. Ubiquiti continued to monitor Hoky's activities and determined that in October 2011, the Hoky facility shipped 31,000 fake Ubiquiti products with a value of about $1 million. In order to close down the counterfeit scheme, Ubiquiti pursued a criminal case against the perpetrators in China.

35.     On November 17, 2011, the Shenzhen Public Security Bureau raided the Hoky facility and seized evidence of the counterfeit operations and arrested Deng. Deng was released at the end of December 2011 after he obtained the Argentinean trademark registration for UBIQUITI NETWORKS from Hsu, and soon thereafter, the Hoky facility resumed its counterfeit operations.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

36.     On or about October 13, 2011, Ubiquiti filed with the SEC a Form S-1/A Registration Statement (the "Registration Statement"), which would later be utilized for the IPO. The Registration Statement incorporated by reference all subsequently filed prospectuses. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

37.     On or about October 14, 2011, Ubiquiti filed its Prospectus for the IPO, which forms part of the Registration Statement and which became effective on October 14, 2011. The Registration Statement and Prospectus represented the following as a risk factor from counterfeit activities:

> If our contract manufacturers do not respect our intellectual property and trade secrets and if they or others produce competitive products reducing our sales or causing customer confusion, our business, operating results and financial condition could be materially adversely affected.
>
> Because our contract manufacturers operate in China, where prosecution of intellectual property infringement and trade secret theft is more difficult than in the United States, certain of our contract manufacturers, their affiliates, their other customers or their suppliers may attempt to use our intellectual property and trade secrets to manufacture our products for themselves or others without our knowledge. Although we attempt to enter into agreements with our contract manufacturers to preclude them from using our intellectual property and trade secrets, we may be unsuccessful in monitoring and enforcing our intellectual property rights in China. We have in the past found and expect in the future to find counterfeit goods in the market being sold as Ubiquiti products. Although we take steps to stop counterfeits, we may not be successful and network operators and service providers who purchase these counterfeit goods may have a bad experience and our brand may be harmed. If such an impermissible use of our intellectual property or trade secrets were to occur, our ability to sell our products at competitive prices and to be the sole provider of our products may be adversely affected and our business, operating results and financial condition could be materially and adversely affected.

38.     The Registration Statement concealed the nature and extent of the counterfeit activities engaged in by Kozumi and Hoky, including concealing the ongoing nature of the activities. The Registration Statement further concealed the impact the counterfeit operations would have on the Company's future results, including lower revenue, as customers would mistakenly purchase counterfeit versions of the Company's products, and higher expenses, as it would need to substantially increase its expenses in order to protect its intellectual property.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

39.     The IPO was successful for the Company, its insiders and the underwriters. In connection with the IPO, at least 7.038 million shares of Ubiquiti common stock were sold to the public at $15 per share, raising $105.6 million in gross proceeds for the Company and the selling shareholders. In the IPO, several of Ubiquiti's officers and directors sold shares of their personally held Ubiquiti stock, including two of the defendants. Defendant Ritchie sold 82,500 shares of his Ubiquiti stock for gross proceeds of $1.2 million. Defendant Ocampo sold 297,000 shares of his Ubiquiti stock for gross proceeds of $4.5 million. In addition, John Sanford, the Company's Chief Technology Officer, sold 123,145 shares of his Ubiquiti stock for gross proceeds of $1.8 million, and Benjamin Moore, Vice President of Business Development, sold 374,370 shares of his Ubiquiti stock for gross proceeds of $5.6 million.

40.     On November 10, 2011, Ubiquiti issued a press release announcing its first quarter fiscal 2012 financial results. The Company reported net income of $21.5 million, non-GAAP diluted earnings per share ("EPS") of $0.23, and revenue of $79.2 million for the quarter. Defendants Pera and Ritchie commented on the results, stating in pertinent, as follows:

> "Overall we are pleased with our first quarter as a public company. We see this as a very good start to our ambitious goal of becoming a leading player in the global communications technology market," said Robert J. Pera, Founder and Chief Executive Officer of Ubiquiti Networks.

> Mr. Pera continued, "This quarter marked the introduction of our AirViston IP video surveillance platform; this exciting new product is our third technology platform following our disruptive AirMax platform, and our enterprise WiFi UniFi platform launched earlier this year. With all three platforms showing strong end market demand and also taking into account several additional technology platforms targeted for market introduction this fiscal year, we look for our growth and financial momentum to continue.

> "Our solid first quarter results reflect strong demand worldwide for our technology platforms," said John Ritchie, Chief Financial Officer. "We continue to drive our financial results with our high productivity and cost-effective business model, and look to further this leverage as we add additional products to our established global distribution network."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

41.     On January 31, 2012, Ubiquiti issued a press release announcing its second quarter fiscal 2012 financial results. For the quarter, the Company reported net income of $24.7 million, non-GAAP diluted EPS of $0.27, and revenue of $87.8 million for the quarter, Defendant Pera commented on the results, stating, in pertinent part, as follows:

> "We recorded another solid quarter that exceeded expectations and outperformed our long-term targeted financial model. The quarter marked the start of revenue contribution from our third technology platform, AirVision, a cost disruptive, advanced IP Video surveillance system solution. AirVision, like our AirMax and UniFi platforms, follows the unique Ubiquiti R&D template in which we design software foundations focused on a powerful user experience and hardware with great price performance characteristics," said Robert J. Pera, Founder and Chief Executive Officer of Ubiquiti Networks." We are pleased with our early success in scaling and replicating our model across multiple connectivity technologies and are excited to compete in new addressable markets."

42.     On May 1, 2012, Ubiquiti issued a press release announcing its third quarter fiscal 2012 financial results. For the quarter, the Company reported net income of $27.9 million, non-GAAP diluted EPS of $0.30, and revenue of $91.7 million for the quarter.

43.     After releasing its third quarter fiscal 2012 results on May 1, 2012, Ubiquiti hosted a conference call where Defendants represented the following:

> [PERA:] A key differentiator across all of our platforms is our IP, whether it is our proprietary technology or our highly regarded brands. We plan on increasing our legal efforts around IP and brand protection as well as to protect our customers from counterfeiters. The hiring of our new general counsel with significant experience in this area was a step in this direction.

> Going forward, we intend to aggressively defend our IP to the full extent of the law, especially in foreign markets, where our brand is particularly strong, but markets that tend to be less disciplined about IP protection. Whether through patent and trademark filing or seeking legal retribution from those that infringe on our patents and steal our technology and potentially damage our brand, we intend to increase our focus and financial commitment to this area.

\*          \*          \*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

[RITCHIE:] Now, a little more detail in terms of our forecasted expenses. As we look ahead to the fourth quarter, we expect to see a meaningful increase in operating expenses of approximately $1.5 million. The largest component of this increase relates to costs to protect our intellectual property, as Robert discussed earlier.

As we become more and more successful, we have unfortunately become the subject of counterfeiting efforts. We intend to be aggressive in defending our IP and the Ubiquiti brand around the globe. After this increase, we expect our operating expenses to stay in the range of 8.5% to 9%, driven in the future primarily by increased R&D investments.

44.     The statements referenced in ¶¶ 36-37; 40-43 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including: (i) the true magnitude of the risks the Company faced from counterfeit goods in connection with the Company's products including the popular and profitable AirMax; (ii) the widespread nature and extent of the counterfeit operations and the impact the counterfeit activities would have on the Company's future operating results; (iii) the increased risks to the Company's operations due to its unique business model, whereby it relied exclusively upon distributors to sell its products to end customers; (iv) that the Company lacked the proper internal controls to prevent its product designs from being stolen and replicated; and (v) as a result of the above, that the Company's financial statements were materially false and misleading at all relevant times.

### THE TRUTH BEGINS TO EMERGE

45.     In response to the Company's efforts to curb the counterfeit ring, in April 2012, Hsu and Deng began circulating rumors in China that Defendant Pera and the Company had ties with the Chinese mafia and had enlisted the mafia to assist the Company in disputes with its competitors. News of the rumors emerged in the United States on or around May 2, 2012, when the news was picked up by the international media.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

46.   On May 2, 2012, Defendant Pera issued an internal memo to Ubiquiti's employees which was leaked to the market later the same day, wherein he denied the allegations. The memo stated in relevant part:

> As you know, we have been battling counterfeiters in China. The criminals are very clever; both former Ubiquiti distributors. One is Chinese living in DongGuan, China where are [sic] contract manufacturers(CM's) are based, the other is Taiwanese living in the United States running a WISP distributor in Argentina. They are working as a team.
>
> In 2011, we stopped doing business with both individuals because they broke our distributor agreement rules. Later that year, we discovered they had setup a factory in DongGuan producing exact 100% identical versions of our products. We believe they had paid someone inside our CM's, stole our PCB design files, schematics, BOM's, artwork, Factory CD; everything. They even hired former production engineers from LIteOn (our largest CM) to set up their manufacturing testing and processes. And, they used their Ubiquiti reseller connections to blend the counterfeit products into the Ubiquiti sales channel. Because the counterfeit products were based on our designs, artwork, and manufacturing processes; customers were not able to tell the products were counterfeit. They thought they were buying genuine Ubiquiti products.
>
> When we discovered what was going on, we hired legal counsel in China to aggressively shut them down. We were successful and the Chinese individual (based in DongGuan, China) went to jail where he stayed awaiting trial.
>
> We tried our best to make the case public to remove the possibility the criminal could pay his way out of trouble, but unfortunately, the criminal was able to pay off the judge in DongGuan and was released early this year. Following the release, the criminals now feel empowered and are attempting to ramp up their operations. We also have ramped up our legal efforts to fight them. Jessica Zhou (our new General Counsel) was hired in March and she has been very aggressive in building a team in China and putting legal pressure on the criminals and their supply chains.
>
> Feeling the pressure, I had recently received emails from the criminals threatening to damage our public reputation if we continue to pursue them. I refused.
>
> It appears in the past several days, they have made good on their threats. I want everyone to know what is being said is not true. As a U.S. public company, we must obey FCPA (Foreign Corrupt Practices Act) which prohibits us from directly or indirectly using any form of bribery or illegal means to solve problems in China and we have been very careful in following the rules. The original story was posted by the criminals using a fake account on a China blogging site and in

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

explicably managed to get picked up by credible news sources (most likely with the help of those who are betting against our stock). We have been working today with most of the news sources and they have taken the story down. Additionally, we are pushing to have them post a formal apology for irresponsibly publicizing the unfounded allegations.

Please do not get distracted by this; it will pass. I have very high confidence in Jessica Zhou and believe her team will have the case resolved soon. Please stay focused on your projects; we are behind on many of them and must accelerate our time to market.

47.   After this news, Ubiquiti shares plummeted $6.10 per share or more than 17%, to close at $28.90 per share on May 2, 2012.

48.   On May 3, 2012, Ubiquiti issued a press release entitled "Ubiquiti Networks Launches Worldwide Campaign to Protect Its Intellectual Property Rights," which stated in relevant part:

Ubiquiti Networks, Inc., a next-generation communications technology company reiterated with its customers the discovery of counterfeit products on the market and launched a worldwide campaign to aggressively defend its intellectual property and protect its customers.

The company believes that as a result of the effectiveness of its campaign, it has become subject to malicious and false accusations posted on overseas websites by those infringing on its intellectual property, and these false accusations have subsequently been reposted by unwary media outlets and news aggregators. "While we do not normally comment on rumors, we take our business reputation very seriously and strive to conduct all of our activities in compliance with the law," said Jessica Zhou, General Counsel and Vice President of Legal Affairs of the company, "Our worldwide intellectual property protection efforts demonstrate that we take our customers' interest to heart and that we remain firmly committed to being a technology leader."

49.   On May 21, 2012, Ubiquiti announced that it had filed a lawsuit against Kozumi on May 18, 2012, and was seeking a temporary restraining order and permanent injunction against Kozumi to stop the counterfeiting ring from producing and distributing counterfeit Ubiquiti products. In the lawsuit, the Company acknowledged that the decline in the value of Ubiquiti's stock earlier in the month was due to the market's realization of the counterfeit

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

activities.

50.    On July 9, 2012, Ubiquiti issued a press release entitled "Ubiquiti Wins Preliminary Injunction Against Principal of Counterfeiting Operation," which stated in relevant part:

Ubiquiti Networks, Inc., a next-generation communications technology company, announced a major legal victory when a federal judge at the U.S. federal court for the Northern District of California last week granted a preliminary injunction enjoining Kozumi USA Corp. and its owner Shao Wei (William) Hsu from:

- using in any manner any registered trademark owned by Ubiquiti, the UBIQUITI, UBIQUITI NETWORKS, and Ubiquiti logo mark, or any name or mark that wholly incorporates or is confusingly similar to these trademarks;

- moving, destroying, or otherwise disposing of any items confusingly or deceptively similar to Ubiquiti's products and that bear any of Ubiquiti's trademarks;

- moving, destroying, or otherwise disposing of any records or documents containing information related to the manufacturing, distributing, delivering, shipping, importing, exporting, marketing, promoting, selling, or otherwise offering for sale of items that bear

- any of Ubiquiti's trademarks; and

- assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the above activities.

51.    On August 9, 2012, Ubiquiti issued a press release announcing its fourth quarter and fiscal year 2012 financial results for the year ended June 30, 2012. The Company reported net income of $28.5 million, non-GAAP diluted EPS of $0.30, and revenue of $94.9 million for the fourth quarter of fiscal 2012. Further, the Company reported net income of $102.6 million, non-GAAP diluted EPS of $1.09, and revenue of $353.5 million for the year ended June 30, 2012. The release further stated in relevant part:

Added Mr. Pera:" The Ubiquiti brand is dominant in our markets and demand for our technology is stronger than ever. This dominance has led to an unfortunate side effect whereby a few previously terminated distributors setup counterfeit

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

14

AirMax manufacturing operations. Although they have impacted our sales channel and caused some marketplace confusion, we have made substantial and tangible progress in diminishing their activities through a comprehensive legal strategy that has resulted in imprisonment, injunctions, and asset freezes of the counterfeiters. In addition, Ubiquiti has implemented sophisticated anti-counterfeit manufacturing processes to substantially protect all of our new platforms and new AirMax products against any future counterfeit attempts."

Business Outlook

Ubiquiti currently believes the demand environment in its end markets supports the following forecast for the Company's fiscal first quarter ending September 30, 2012:

- Revenues of $62 million to $70 million

- GAAP Diluted EPS of $0.14 to $0.17

- Non-GAAP Diluted EPS of $0.14 to $0.17

- We believe that the amount of counterfeited goods, combined with the impact it has on our distributor's inventory and the purchasing patterns of our customers, will impact our business outlook for the next two fiscal quarters.

- Ubiquiti has taken comprehensive legal actions to stop the counterfeiters and minimize the impact of their activities.

52.     As a result of this news, Ubiquiti shares declined $6.30 per share, or nearly 42%, to close at $8.71 per share on August 10, 2012.

53.     On August 10, 2012, Wedbush Securities downgraded its rating on Ubiquiti from Outperform to Neutral and lowered its price target from $17.00 to $8.00 and noted that it "underestimated the magnitude of the company's challenges as it relates to the prevalence of counterfeit products in the channel and concerns regarding Ubiquiti's distribution model."

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired shares of Ubiquiti common stock during the Class Period and/or pursuant or

traceable to the Company's false and misleading Registration Statement for its IPO, and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.    The members of the Class are so numerous that joinder of all members is impracticable. Ubiquiti stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ubiquiti or its transfer agent and maybe notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Ubiquiti has more than 91.8 million shares of stock outstanding.

56.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

57.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are;

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period and in the Registration Statement misrepresented material facts about the business, operations and management of Ubiquiti; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members maybe relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF
## COUNT I
### (Against All Defendants
### For Violation of Section 11 of the Securities Act)

60.     Plaintiff repeats and realleges each and every allegation contained above, except any allegations of fraud, recklessness or intentional conduct.  This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

61.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

62.     This Count does not sound in fraud. All of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. Plaintiff does not

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

allege that the Officer Defendants, Director Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

63.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

64.     Ubiquiti is the registrant for the IPO. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

65.     As issuer of the shares, Ubiquiti is strictly liable to plaintiff and the Class for any misstatements and omissions.

66.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

67.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

68.     Plaintiff acquired Ubiquiti shares pursuant and/or traceable to the Registration Statement for the IPO.

69.     Plaintiff and the Class have sustained damages. The value of Ubiquiti common stock has declined substantially subsequent to and due to defendants' violations.

70.     At the time of their purchases of Ubiquiti shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to May 1, 2012. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three

years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the Securities Act
### <u>Against the Officer and Director Defendants</u>

71.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

72.    This count is asserted against the Officer and Director Defendants and is based upon Section 15 of the Securities Act.

73.    The Officer and Director Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Ubiquiti within the meaning of Section 15 of the Securities Act.  The Officer and Director Defendants had the power and influence and exercised the same to cause Ubiquiti to engage in the acts described herein.

74.    The Officer and Director Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

75.    By virtue of the conduct alleged herein, the Officer and Director Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### <u>Against Ubiquiti and the Officer Defendants</u>

76.    Plaintiff repeats and realleges each and every allegation contained above as if

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
19

fully set forth herein.

77.     This Count is alleged against Defendants Ubiquiti and the Officer Defendants.

78.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ubiquiti securities; and (iii) cause Plaintiff and other members of the Class to purchase Ubiquiti securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

79.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ubiquiti securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ubiquiti's finances and business prospects.

80.     By virtue of their positions at Ubiquiti, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

81.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Ubiquiti securities from their personal portfolios.

82.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Ubiquiti, Defendants Ubiquiti and the Officer Defendants had knowledge of the details of Ubiquiti's internal affairs.

83.     Defendants Ubiquiti and the Officer Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants Ubiquiti and the Officer Defendants were able to and did, directly or indirectly, control the content of the statements of Ubiquiti.  As officers and/or directors of a publicly held company, Defendants Ubiquiti and the Officer Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ubiquiti's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of

the aforementioned false and misleading reports, releases and public statements, the market price of Ubiquiti securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ubiquiti's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Ubiquiti securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

84.     During the Class Period, Ubiquiti securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Ubiquiti securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Ubiquiti securities were substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ubiquiti securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public related to implementation revenue.

## COUNT IV

### For Violation of §20(a) of the Exchange Act
### Against the Officer Defendants

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     During the Class Period, the Officer Defendants participated in the operation and management of Ubiquiti, and conducted and participated, directly and indirectly, in the conduct of Ubiquiti' business affairs.  Because of their senior positions, they knew the adverse non-public information about Ubiquiti's misstatement of income and expenses and false financial statements.

89.     As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Ubiquiti's financial condition and results of operations, and to correct promptly any public statements issued by Ubiquiti which had become materially false or misleading.

90.     Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ubiquiti disseminated in the marketplace during the Class Period concerning Ubiquiti's results of operations.   Throughout the Class Period, the Officer Defendants exercised their power and authority to cause Ubiquiti to engage in the wrongful acts complained of herein.  The Officer Defendants therefore, were "controlling persons" of Ubiquiti

within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ubiquiti securities.

91.     The Officer Defendants, therefore, acted as a controlling person of Ubiquiti.  By reason of their senior management positions and/or being directors of Ubiquiti, the Officer Defendants had the power to direct the actions of, and exercised the same to cause, Ubiquiti to engage in the unlawful acts and conduct complained of herein.   The Officer Defendants exercised control over the general operations of Ubiquiti and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92.     By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ubiquiti.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.     Awarding rescissionary damages; and

E.     Awarding such equitable, injunctive or other relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:   September 13 , 2012                    **GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

**POMERANTZ GROSSMAN HUFFORD
   DAHSLTROM & GROSS LLP**
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665

**POMERANTZ GROSSMAN HUFFORD
   DAHSLTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:    (312) 377-1181
Facsimile:    (312) 377-1184

*Attorneys for Plaintiff*

## CERTIFICATION OF BRIAN GOECKER PURSUANT TO
## THE PRIVATE SECURITIES LITIGATION REFORM ACT

I, Brian Goecker, hereby declare as follows:

1.     I have reviewed the facts and allegations in a complaint against Ubiquiti Networks, Inc.
       ("UBNT") and related parties, and authorize its filing.

2.     I did not purchase UBNT securities at the direction of plaintiffs' counsel or in order to
       participate in any private action under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of a class, including providing
       testimony at deposition and trial, if necessary.

4.     The attached Schedule A lists all of my purchases and sales in UBNT securities for the
       class period between October 14, 2011 and August 9, 2012.

5.     During the three year period preceding the date hereof, I have not sought to serve as a
       representative party on behalf of a class under the federal securities laws.

6.     I will not accept any payment for serving as a representative party on behalf of a class
       beyond my pro rata share of any recovery, except for reasonable costs and expenses
       (including lost wages) directly relating to the representation of the class, as ordered or
       approved by the Court.

       I declare under penalty of perjury that the foregoing is true and correct.

       Executed on this 10th day of September, 2012 at Houston, TX.

                                    _____
                                    Brian Goecker

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Purchases**

| Date Acquired | Amount of Securities | Price |
|---|---|---|
| 5/11/12 | 140 | $21.746 |

**Sales**

No sales